IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 23, 2014

## JAMAR MCFIELD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 283406      Don W. Poole, Judge**

_____

**No. E2013-02434-CCA-R3-PC - Filed August 11, 2014**

_____

The petitioner, Jamar McField, appeals the denial of his petition for post-conviction relief, which challenged his 2009 Hamilton County Criminal Court jury convictions of felony murder and aggravated child abuse. In this appeal, the petitioner claims that he was deprived of the effective assistance of counsel at trial. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and JOE H. WALKER, III, SP. J., joined.

John Allen Brooks, Chattanooga, Tennessee, for the appellant, Jamar McField.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William H. Cox, III, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In 2009, a Hamilton County Criminal Court jury convicted the petitioner of felony murder and aggravated child abuse for the death of four-year-old Keanon Beamon, the son of the petitioner's girlfriend. The victim's mother left him in the petitioner's care, and when the victim's nine-year-old sister returned home from school, she discovered the victim's naked, lifeless body in her mother's bed. *See State v. Jamar McField*, No. E2009-02472-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, June 27, 2011). When the victim's mother returned from work, her daughter told her that the victim was dead, and she found him lying naked in her bed. The victim's mother telephoned for an

ambulance, and the victim was transported to the hospital while the victim's mother and the petitioner were transported to the police station for questioning. The petitioner claimed that the victim died after a fall in the bathtub and admitted that he did not telephone 9-1-1 for more than 30 minutes after the victim died. An autopsy revealed the following:

> [T]he victim suffered blunt force injuries to the chest, abdomen, and head. The victim had lacerations to his liver, lesser omentum, and spleen. The victim also had excessive blood around his abdomen, colon, and kidney. There was additional bruising to the back of the victim's abdomen, pancreas, small intestine, mesentery, kidney, lungs, mediastinum, pericardium, diaphragm, chest, back, thighs, and left upper arm. . . . [T]he victim also suffered injuries to his head. There were contusions to the victim's scalp and brain, and blood had collected under the covering of his brain.

*Jamar McField*, slip op. at 10. Medical testimony established that "the victim bled to death over a period of thirty minutes to one hour" and that he "would have been in a 'good bit of pain' and was '[p]robably screaming and crying.'" *Id.*, slip op. at 11. The trial court imposed a sentence of life imprisonment for the petitioner's conviction of felony murder and a concurrent sentence of 20 years for the petitioner's conviction of aggravated child abuse. This court affirmed the convictions and accompanying sentence on direct appeal. *Id.*, slip op. at 25. The petitioner did not file an application for permission to appeal to our supreme court.

In March 2012, the petitioner filed a timely petition for post-conviction relief, alleging, among other things, that he was deprived of the effective assistance of counsel at trial and on appeal because his attorney had a conflict of interest, failed to challenge on appeal the sufficiency of the convicting evidence, failed to challenge the jury instructions, and failed to assert the defense of mistake of fact. Following the appointment of counsel, the petitioner filed an amended petition for post-conviction relief claiming that his trial counsel performed deficiently by failing to request a forensic mental evaluation, by failing to present evidence of the petitioner's mental health at trial, by failing to timely interview all the witnesses, and by failing to investigate an alternative cause of the victim's death.

At the evidentiary hearing, trial counsel testified that she was appointed to represent the petitioner before the preliminary hearing. She said that the theory of the defense, that the victim's injuries resulted from his falling in the bath, was based upon the defendant's statements to the police and his claims to trial counsel. Counsel acknowledged that the theory of defense "was going to be difficult to argue" given "that the severity of the

-2-

injury was extreme blunt [force] trauma," but she said that because the petitioner "had given the statement . . . that was our defense." She said that she did not seek the services of a forensic pathologist to testify at trial because the medical examiner's findings and testimony were not antithetical to the theory of defense. Counsel said that, given the difficulty in establishing that the victim's injuries occurred by accidental means in the face of the medical proof, she "tried to settle this case several times," and she eventually secured from the State a plea offer that would have required the petitioner to serve 25 years. She testified that the petitioner rejected the offer and "was very consistent with what happened that day and his story . . . and he really was unwavering from that."

Counsel testified that she moved to suppress the petitioner's statements to the police, but she could not recall whether she made the motion orally or in writing. In any event, the trial court denied the motion following a hearing. She noted that this court agreed that one of the defendant's statements should have been suppressed.

Counsel recalled that she obtained the petitioner's mental health records from "Cumberland Hall" and "Fortwood" prior to trial. She said that the records indicated that the petitioner "ha[d] a long history of oppositional defiant disorder, explosive anger disorder and impulse control not otherwise specified." Counsel agreed that the petitioner was placed in Cumberland Hall when he was 14 years old and that he "had an extensive juvenile history and . . . had to be in State's custody because his mother was not capable of taking care of him." She testified that the Fortwood records indicated that the petitioner had been prescribed Lithium in the days before the victim's murder. Counsel said that despite the petitioner's mental health history, she did not request a forensic evaluation because she "never had any question about his competency." She explained, "He always seemed to know what was going on. He helped me formulate the defense, I mean he was the one that helped me do it." She added that "[t]here wasn't anything bizarre in his statement that would indicate that he was somehow compromised and didn't understand the nature and wrongfulness of his act." Counsel said that, during their conversations, the petitioner "was pretty adamant that he wasn't mentally ill."

Counsel added that she believed that requesting a forensic evaluation would ultimately have proved deleterious to the petitioner's case given that his mental health history established that he had a long history of violent outbursts. She said, "I thought it would be disastrous for the State to get this history of a very violent boy, and young man, with these repeated findings that he had this explosive anger disorder." Counsel testified that given that the petitioner's mental health history would not have supported an insanity defense, she did not think it wise to bring up the petitioner's mental health history at all.

Counsel testified that she did not ask any questions of the victim's sister

because the sister's testimony was consistent with the defendant's statement to the police and because she "frankly didn't want to bully her, because . . . that's a bad strategy." Counsel said that she did not ask any questions of the emergency room physician because his only testimony was that the victim was dead upon his arrival at the emergency room.

Counsel stated that she was aware that the victim's mother had been convicted of "severe abuse" of one of her children before the victim's death but that the trial court ruled that information inadmissible.

Regarding the petitioner's decision not to testify at trial, counsel testified that the petitioner "never wanted to testify." She added, "And I'm not sure what . . . he could have added to his statement . . . if that was his theory of the case."

During cross-examination, counsel testified that, despite his mental health history, the petitioner "had never been found to be not competent in juvenile court." She said that she had experienced no difficulty in communicating with the petitioner and that he never complained of hallucinations. Counsel said that the petitioner testified at the suppression hearing and that he made the decision not to testify at trial. She testified that the petitioner "[a]solutely" understood his right to testify. Counsel said that she had requested "hundreds" of forensic evaluations during her career.

Records from the defendant's May 6, 2004 visit to Fortwood demonstrated that the petitioner had a history of violent outbursts and had been diagnosed with intermittent explosive disorder, marijuana abuse, and alcohol abuse. The petitioner did not report any hallucinations or having anything other than a normal mood at that time. A May 23, 2003 visit indicated a diagnosis of oppositional defiant disorder. The defendant did not complain of hallucinations at that visit. He also did not complain of hallucinations during visits on July 19, 2004, and March 26, 2007. During a March 30, 2007 visit, however, he complained of "mood swings, irritability, insomnia" and occasional auditory hallucinations. During that visit, the petitioner admitted "drinking heavily every day" and "marijuana use." The defendant was diagnosed with bipolar disorder and borderline intellectual functioning along with marijuana and alcohol abuse. During a September 24, 2007 visit, the defendant again complained of auditory hallucinations and admitted "drinking alcohol heavily and using marijuana intermittently." The defendant also acknowledged that he had not taken the medication prescribed to him in March 2007.

Records from the defendant's May 2000 evaluation at Cumberland Hall, when he was 14 years old, showed that the defendant was diagnosed with impulse control disorder. Other visits during the petitioner's time at Cumberland Hall included diagnoses of oppositional defiant disorder and marijuana abuse.

The petitioner testified that he was sent to "Pinebreeze and Smallwood" when he was nine years old because "[d]octors and stuff" said that the petitioner "was sick." He could not recall how long he spent at either facility. The petitioner said that he later spent "[a]bout two years" at Cumberland Hall when he was 14. The petitioner said that he had had auditory hallucinations then and since that time but he did not report them "because they say you crazy." He adamantly maintained that he was "not crazy." He said that the voices told him that "like people trying to get [him], stuff like that, or you know, those type of things." The petitioner reported that he had taken an anti-psychotic medication during his trial. He said that he told counsel about his mental health history, but he could not recall whether he asked for a forensic evaluation.

The petitioner said that he could recall having only three meetings with counsel prior to trial. He testified that the State's plea offer came "a long time" before the trial. He claimed that, had the offer come on the eve of trial as stated by trial counsel, he would have accepted the offer. The petitioner also claimed that he did not testify at trial because counsel "told [him] not to." He said, generally, that counsel should have done what he "asked her to do," but he could not recall anything that he had asked of counsel that was not done.

The petitioner said that he returned to Fortwood in the days before the murder to "get . . . some help, get [his disability] checks started back."

During cross-examination, the petitioner claimed that his statements to police were fabrications and that the victim was "unresponsive" when the petitioner first went to check on him in the morning. He admitted putting the unresponsive victim into the bathtub "to clean him off." The defendant testified that he did not have any hallucinations on that or any other day. The defendant also admitted that it was his decision not to testify at trial.

At the conclusion of the hearing, the post-conviction court took the petition under advisement. In its written order denying post-conviction relief, the court concluded that the petitioner failed to establish his claim of ineffective assistance of counsel by clear and convincing evidence. As is relevant to this appeal, the court found that counsel completed an adequate and timely investigation of the case and that counsel did not perform deficiently by failing to further investigate the petitioner's mental health given "that the petitioner did not give any indication, whether at the time of his statements to police, his testimony at the suppression hearing, his waiver of the right to testify, or his post-trial complaints about counsel, that he was incompetent to stand trial." The court further found that, "[a]s for the petitioner's mental status at the time of the offenses, even in his post-conviction testimony, he does not blame his actions on his mental status." The court concluded that under "the circumstances, it was reasonable for counsel to avoid making his mental-health history, which was a history of an explosive temper and violent behavior, an

-5-

issue at trial."

In this timely appeal, the petitioner claims that counsel performed deficiently by failing to adequately prepare for trial and by failing to further investigate the petitioner's mental health history.[1]

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A.§ 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the post-conviction court's findings of fact are conclusive unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn.1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn.1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App.1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn.

---

[1]At this point we note that, although the petitioner's brief contains a page titled "Statement of Issues," the brief does not contain an actual statement of the specific issues presented for review. We address those issues we believe to be presented as we glean them from other portions of the brief.

Crim. App. 1992).

The petitioner's chief complaint appears to be that counsel "failed to investigate and present evidence of mental health history." Initially, we note that the petitioner's "mental health history" was only relevant in his case to the extent that it indicated his incompetence to stand trial or his inability to form the requisite mens rea for the conviction offenses. Because the petitioner does not argue that he was incompetent to stand trial or that he was prevented, by mental disease or defect, from forming the mens rea required in this case, his mental health history was irrelevant. Moreover, counsel's accredited testimony established that the petitioner's behavior did not suggest that he was incompetent, and nothing in the records exhibited to the post-conviction hearing suggested otherwise.

The petitioner also complains that his trial counsel failed to adequately prepare for trial, a claim that appears to be founded upon the fact that counsel did not file a written motion to suppress the petitioner's statements. Counsel testified that she could not recall whether she had filed a written motion to suppress the petitioner's statements, but she recalled that she did move the court to suppress the statements and that the court conducted a hearing on the motion. The record reflects as much. We cannot fathom how counsel's failure to file a written suppression motion equates to deficient performance when counsel's oral motion was thoroughly heard and denied.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE